UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
SHARON BROWN,

            Plaintiff,

      -against-

CAROLYN COLVIN, Commissioner of
Social Security,

            Defendant.
----------------------------------------x

<u>**NOT FOR PUBLICATION**</u>

**MEMORANDUM AND ORDER**
14 Civ. 2411 (KAM)

**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C. § 405(g), plaintiff Sharon Brown ("plaintiff"), appeals the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "defendant"), which found that plaintiff was not eligible for disability insurance benefits under Title II of the Social Security Act ("the Act") or Supplemental Security Income ("SSI") benefits under Title XVI of the Act, on the ground that plaintiff is not disabled within the meaning of the Act.

      Plaintiff alleges that she is disabled within the meaning of the Act and is entitled to receive the aforementioned benefits. Plaintiff further alleges that the Administrative Law Judge ("ALJ") erred in finding that she was not *per se* disabled under the act, improperly afforded limited weight to the opinion of plaintiff's treating physician, and improperly discredited plaintiff's credibility. Presently before the court are the parties' cross-motions for judgment on the pleadings. For the

1

reasons set forth below, both parties' motions are denied and this case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

**BACKGROUND**

## I.    Procedural History

On July 19, 2011, plaintiff filed her application for disability insurance benefits alleging disability on the basis of hypertension, sarcoidosis, a soft mass in her left shoulder, and dizziness for a period of disability beginning in November 2010.  (ECF No. 17, Administrative Transcript ("Tr.") 179-87.) On July 20, 2011, plaintiff filed a Title XVI application for supplemental security income alleging the same disabilities as in her application for disability insurance.  (Tr. 163-78.) Both claims were denied by the Social Security Administration ("SSA") on November 1, 2011.  (Tr. 91-109.)

On December 6, 2011, plaintiff requested an administrative hearing.  (Tr. 113-122.)  October 10, 2012, plaintiff, appeared before ALJ Gal Lahat in Queens, New York, represented by John Moran, Esq.  Plaintiff testified at the hearing, as did an impartial vocational expert, Ms. Amy Leopold. (Tr. 53-90.)

By a decision issued on October 26, 2012, the ALJ found that plaintiff was not disabled within the meaning of the Act and thus not entitled to benefits or SSI.  (*See* Tr. 29-52.)

Specifically, the ALJ found that plaintiff had the residual functioning capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). (Tr. 37.)

Plaintiff appealed the ALJ's decision to the Appeals Council on January 31, 2013. (Tr. 15-18.) Plaintiff submitted additional evidence to the Appeals Council on March 15, 2013. (Tr. 12-14.) The Appeals Council denied plaintiff's request on February 12, 2014, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-8.) (Tr. 4-8.) This federal action followed.

Plaintiff commenced this instant action on April 14, 2014. (ECF No. 1, Complaint.) Plaintiff filed her Motion for Judgment on The Pleadings on September 12, 2014. (ECF No. 13, Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mot."); 14, Plaintiff Memorandum of Law in Support of Judgment on the Pleadings ("Pl. Mem.").) Defendant filed her Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings on December 4, 2014. (ECF No. 15, Defendant's Cross-Motion for Judgment on the Pleadings ("Def. Mot."); 16, Defendant's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings ("Def. Mem.").)

## II. Factual Background

### A. Plaintiff's Non-Medical History

Plaintiff was born on September 20, 1962 and was 48 years old at the time of the alleged disability onset date, November 2, 2010.  (Tr. 203, 235.)  She reports that she has completed high school, (Tr. 208, 235, 259), and has no problem speaking or understanding English.  (Tr. 206.)  In a disability report dated July 19, 2011, plaintiff indicated that she was disabled due to hypertension, sarcoidosis, a left arm anterior shoulder soft mass, and dizziness.  (Tr. 207, 255.)  She reported that she took hydrochlorothiazide to treat her high blood pressure, Symbicort to prevent bronchospasms, Prednisone to treat her inflammation, and Spiriva to open up her airways.  (Tr. 213, 257.)  Plaintiff uses a blood pressure monitor when she feels dizzy, and when it is too high she goes to the emergency room.  (Tr. 222.)

Plaintiff reported in a function report dated August 18, 2011, that she was not currently employed and that she had stopped working on November 2, 2010 due to her medical condition.  (Tr. 207, 258.)  Plaintiff was previously employed as a child care worker who cared for three children from November 2005 until November 2010.  (Tr. 208-09, 258-59.)

Plaintiff reported that she lived alone in an apartment, and that during the day, if she did not have a

medical appointment, she typically takes her medication, goes the bathroom, watches television, and sits outside with her boyfriend, sister or a friend. (Tr. 215-16.) Plaintiff reported that she does not care for anyone else, and that she needs assistance at times getting dressed, bathing, caring for herself, feeding herself, and using the bathroom. (Tr. 216-17.) Plaintiff reported that she eats fast food or prepares simple meals three to four times weekly, if she does not feel dizzy. (Tr. 217.) She indicated that she does not do many household chores or yardwork, except preparing meals three or four times per week, sweeping, doing dishes and ironing, and requires assistance because she cannot stand long for periods of time. (Tr. 196, 217-18.) She can wash dishes and sweep, and is able to pick up small amounts of groceries. (Tr. 219.)

At the time of her application, plaintiff indicated that she goes outside three times per week, and is able to take public transportation. Although she has a driver's license, she does not drive. (Tr. 219.) Plaintiff reported that she cannot lift at all, cannot stand for long, and can only walk when necessary, and cannot climb stairs, kneel, or squat. (Tr. 220-21.) She has no problems using her hands, seeing, hearing and talking. (Tr. 221.) She stated that she can walk about a block or for a few minutes before needing to rest. (Tr. 222.) She also noted that she is sometimes forgetful, providing as

examples that she often forgets where she places things and her medical appointments. (Tr. 223.)

Plaintiff reported that she first began having pains "months ago," but could not remember the specific date, and that her throat and chest would tighten at times. (*Id.*) She reported that when her neck and chest tighten, she is unable to walk because it is hard to breathe. (Tr. 223-24.) Plaintiff also reported that she sometimes feels pain in her sides and her right arm that come with no warning. These pains last a few minutes. (Tr. 224.) She indicated that she was using an inhaler and taking Symbicort, Spiriva, Prednisone, Advil, and Tylenol for her pain and symptoms. (Tr. 224-25.) Plaintiff indicated that she cannot lie down comfortably. (Tr. 216.) Plaintiff also reports that she is unable to sleep because she feels as if she will choke in her sleep, and therefore sleeps sitting up. (Tr. 195.)

In her Disability Report-Appeal form, plaintiff reported that her condition had not changed. (Tr. 237-43.) She also reported taking the following medications for her symptoms: ibuprofen for her pain, Losartan potassium for her high cholesterol, Nifedipine, Trilipix, and Triamterene for her high blood pressure, Omeprazole for gastroesophageal reflux disease (GERD), and Spiriva for her lungs. (Tr. 240.) She indicated

that Spiriva made her dizzy and Triamterene caused frequent urination.  (*Id.*)

### B.  Administrative Hearing Testimony

#### 1.  Plaintiff's Testimony

Plaintiff testified before ALJ Lahat at her administrative hearing.  Plaintiff testified that she was born on September 20, 1962 in Jamaica.  (Tr. 60.)  She is five feet and five and half inches tall and weighs 160 pounds.  (Tr. 77-78.)  Plaintiff indicated that she was a smoker, but quit in January 2012.  (Tr. 65.)  She does not use drugs such as marijuana, cocaine, or heroin.  (Tr. 68.)  She does not drink, but in the past would occasionally drink a beer.  (Tr. 68, 79.)

Plaintiff finished high school and attended college, but did not complete her college degree.  (Tr. 60.)  In the past, plaintiff worked as a certified nurse's assistant and a childcare worker for three children.  (Tr. 61, 69.)  Plaintiff stated that she quit working approximately two years prior because she was scared to care for the children due to her dizzy spells and difficulty conducting tasks.  (Tr. 62.)

Plaintiff testified that she lives on her own and is able to perform various household chores.  (Tr. 78.)  She is able to perform tasks that require minimal exertion, such as washing the dishes.  (Tr. 64.)  She stated that she can probably cook, but does not because she is afraid.  (Tr. 78.)  In the

beginning of her testimony, she stated she can sweep, (Tr. 65),
but later denied it and testified that her sister assisted her
with household chores such as cleaning. (Tr. 78-79.) She does
her grocery shopping at a store one block away. (Tr. 78.) She
takes public transportation to and from her doctor's
appointments. (Tr. 82-83.) She mainly only leaves the house
for appointments and is accompanied by her boyfriend because of
her fear that she may have a blackout. (Tr. 83-84.) She took
the subway to the administrative hearing and takes the bus to
medical appointments. (Tr. 82-83.)

Plaintiff stated that she tries to do nothing on a
daily basis. (Tr. 64.) She starts her morning by taking her
blood pressure because she tends to feel dizzy and knows that
this is a symptom of high blood pressure. (Tr. 65-66.) She
testified that she feels dizzy at least once every day. (Tr.
74.) Although she has medication for her high blood pressure,
she admitted to sometimes forgetting to take her medicine. (Tr.
67.) She did not take it the day of the hearing due to the
medication's side effects, which include headaches and frequent
bathroom use, approximately every 15 to 20 minutes. (Tr. 75.)

Additionally, plaintiff testified that she is prone to
daily attacks during which her chest and throat tighten. (Tr.
64.) However, she later stated that she did not have these
attacks often because she avoids activities that trigger these

attacks.  (Tr. 84-85.)  Plaintiff has three inhalers she uses to ease her attacks.  (Tr. 70.)  When doing certain chores, she testified that she can have an attack and, if she does not reach her medication in time, she will pass out.  (Tr. 65.)  On an average day, plaintiff reported using her inhaler six times if she stays at home, and five to seven times if she went outdoors. (Tr. 73.)

Plaintiff testified that she had a mass on her left arm that made it painful to lift her shoulder.  (Tr. 76.) Plaintiff refused to undergo the recommended surgery due to fear.  (*Id.*)  Plaintiff testified that she cannot walk more than five minutes without resting and cannot stand for long durations because she gets tired.  (Tr. 81.)  She also is unable to sit comfortably because of a cyst on her left posterior buttock, but can alleviate the pain if she shifts her weight to the right side.  (Tr. 81-82.)

### 2. Vocational Expert Testimony

Amy Peiser Leopold, a vocational expert, testified at the ALJ hearing that plaintiff's former work as a nurse's assistant was classified as medium, unskilled work, and that plaintiff's past former work as a child-care worker was semi-skilled, light work.  (Tr. 88.)

## C.   Plaintiff's Medical History

### 1.   Treating Sources

a.   *Dr. Charlie Chen, D.O., Family Practitioner*

Plaintiff was first treated by Dr. Chen on October 6, 2010 at the Joseph P. Addabbo Family Health Center.  This was plaintiff's first medical evaluation in the past five years.  (Tr. 284.)  She indicated that she had been diagnosed with sarcoidosis ten years prior and was prescribed steroids to treat her symptoms.  (*Id.*)  Plaintiff complained of sarcoidosis-related symptoms, pain in her leg, and pain from the lipoma on her left upper arm.[1]  (*Id.*)  Plaintiff also complained that she had leg pain starting at her hip and shooting down the leg, and that her leg would give out on her at times.  Finally, plaintiff indicated that a mass had been growing on her left upper arm, and that she had difficulty lifting her arm at times.  (*Id.*)  At this time, plaintiff was smoking 1-2 cigarettes per day.  (*Id.*)

After a physical examination, Dr. Chen noted that plaintiff appeared healthy, and that plaintiff experienced wheezing on exhale, but not rhonchi or rales.[2]  (Tr. 285.)  Dr. Chen diagnosed lung wheezing and possible lung infiltration, and

---

[1] A lipoma is a noncancerous growth of fatty tissue cells, most commonly found in the subcutaneous layer just below the skin.  *Lipoma – arm*, MedlinePlus, *available at http://www.nlm.nih.gov/medlineplus/ency/imagepages/1209.htm.*
[2] Rhonchi and Rales are two types of abnormal breath sounds.  Rhonchi are sounds that resemble snoring, that occur when air is blocked or air flow becomes rough through the large airways.  Rales are small clicking, bubbling, or rattling sounds in the lungs, heard on an inhale.  Rales are believed to occur when air opens closed air spaces.  *Breath Sounds*, MedlinePlus, available at http://www.nlm.nih.gov/medlineplus/ency/article/007535.htm.

possible lipoma, polyuria,[3] or polydipsia,[4] and leg pain due to sciatica. (Tr. 285.) Dr. Chen noted the need to rule out sarcoidosis versus chronic obstructive pulmonary disease ("COPD") as possible diagnoses. (*Id.*) Dr. Chen prescribed Prednisone for plaintiff's lungs, and referred her to radiology for chest and lumbosacral x-rays, and to surgery for the possible lipoma on her upper arm. (*Id.*)

On November 3, 2010, Dr. Chen treated plaintiff and reported the same symptoms as above with minimal relief from the prednisone. (Tr. 287.) At this appointment, plaintiff reported coughing with phlegm and the feeling of a lump stuck in her chest without pain. (*Id.*) Dr. Chen found her lungs clear to auscultation and diagnosed plaintiff with sarcoidosis, elevated blood pressure, high cholesterol, and noted the need to rule out a lipoma in the upper left arm. (Tr. 288.) Dr. Chen continued her treatment with Prednisone, and referred her to a pulmonologist, and to surgery for the lipoma on her left upper arm. (*Id.*)

On November 17, 2010, as referred by Dr. Chen, plaintiff had a chest x-ray at Peninsula Radiology Associates.

---

[3] Polydipsia is an excessive thirst or abnormal feeling of always needing to drink fluids that may be a sign of diabetes. *Thirst – excessive*, MedlinePlus, *available at* *http://www.nlm.nih.gov/medlineplus/ency/article/003085.htm.*
[4] Polyuria is the production of an excessive amount of urine. *Urination – excessive amount,* MedlinePlus, *available at* *http://www.nlm.nih.gov/medlineplus/ency/article/003146.htm.*

(Tr. 290.) Anteroposterior (AP) and lateral view x-rays of the chest revealed no acute infiltrates or effusions. (*Id.*) Further, the x-rays indicated that plaintiff's heart was not enlarged. (*Id.*) On February 9, 2011, Dr. Chen treated plaintiff who complained of a sore throat, earache, problems swallowing, and feelings of stress. (Tr. 370.) Plaintiff also sought a referral to a psychologist at this time. (*Id.*) Plaintiff reported that she was smoking a few times a week and had a drink a day. (*Id.*) She was diagnosed with hypertension and sarcoidosis, and was told to continue her use of Hydrochlorothiazide and Prednisone. (*Id.*)

On May 18, 2011, Dr. Chen treated plaintiff, who complained of shortness of breath and dizziness, but reported missing her appointment with pulmonologist. (Tr. 371.) Dr. Chen additionally prescribed Symbicort for her sarcoidosis and Procardia for her hypertension. (*Id.*) Plaintiff returned on May 25, 2011 complaining about dizziness, feeling "whoozy" and chest pains. (Tr. 372.) The diagnosis and prescribed medications were the same as the previous appointment. (*Id.*)

On June 27, 2011, plaintiff had a follow-up examination with Dr. Chen regarding her blood pressure and complaints of shortness of breath. (Tr. 374.) At this time, plaintiff was taking the following medications: Prednisone; Hydrochlorothiazide; Zihromax; Procardia; and Avelox. (*Id.*)

12

Upon examination, Dr. Chen reported that plaintiff's lungs sounded clear and her high blood pressure had improved. (*Id.*) Dr. Chen again prescribed Spiriva, Prednisone, and Symbicort for her sarcoidosis, referred to her to a pulmonologist and cardiologist, and instructed her to come back for a follow-up in two weeks. (*Id.*)

On July 11, 2011, plaintiff returned for her follow-up with Dr. Chen and complained about coughing, left ear pain and blurry vision. (Tr. 375.) She was taking Hydrochlorothiazide, Prednisone, and Procardia at the time. (*Id.*) Dr. Chen diagnosed bilateral ear cerum impact at minor level, and after a cardiac exam, concluded that plaintiff had no heart murmur and that her lungs sounded somewhat dull bilaterally. Dr. Chen continued plaintiff's medication for sarcoidosis and hypertension. (Tr. 375-76.) Dr. Chen again referred plaintiff to a pulmonologist. (*Id.*)

On August 1, 2011, Dr. Chen treated plaintiff, who complained of high blood pressure in the morning, blurry vision, tinnitus,[5] or a ringing, in her left ear, dizziness, frequent loss of consciousness, chest pain during exertion, dyspnea at night, and swelling in her hands and feet. (Tr. 377-78.) Plaintiff denied alcohol use and said she was "slowing down on

---

[5] Tinnitus is a noise or ringing in the ears. It is not a condition itself, but a symptom of an underlying condition. *Tinnitus*, MayoClinic, *available at* http://www.mayoclinic.org/diseases-conditions/tinnitus/basics/definition/con-20021487.

smoking." (*Id.*)  A physical examination indicated that plaintiff had blurry retinal vessels, no significant ear obstruction, her tympanic membranes of her ear were intact, her lungs were clear bilaterally with no wheezing, and there was swelling in her feet. (*Id.*)  Dr. Chen referred plaintiff to a neurologist and cardiologist for her dizziness and blackouts, a pulmonologist for her sarcoidosis, and prescribed medication for hypertension and the fungal infection on her feet. (*Id.*)

Dr. Chen completed an Arbor WeCare medical report for the purpose of Social Security Disability benefits on August 1, 2011. (Tr. 443-48.)  He indicated that he had treated plaintiff from September 20, 2005 to August 1, 2011, and at least once a month since October 2010. (Tr. 443.)  Dr. Chen diagnosed plaintiff with hypertension and sarcoidosis, and noted that she suffered from chest pains on exertion, edema in her hands and feet, dyspnea, dizziness, loss of consciousness, tingling and numbness in toes and fingers, and tinnitus in her left ear. (*Id.*)  Dr. Chen concluded that plaintiff's lungs were clear bilaterally with no wheezes and that a fundoscopic exam showed blurry retinal vessels. (*Id.*)

Dr. Chen made the following conclusions.  Plaintiff's hypertension could produce painful symptoms and her medication, Procardia, could cause dizziness. (Tr. 444.)  Plaintiff cannot walk or stand continuously, but can sit for eight hours

continuously.  (Tr. 445.)  She can continuously lift 0-5 pounds, but never anything heavier.  (*Id.*)  Plaintiff can never bend, squat, climb, or reach, and cannot repetitively push and pull arms.  (*Id.*)  Plaintiff cannot perform fine manipulation and can only grasp with her right hand.  (*Id.*)  Dr. Chen also reported that plaintiff was unable to travel on a daily basis by either bus or subway unless accompanied.  (*Id.*)

On August 15, 2011, plaintiff returned to Dr. Chen and complained of a new sensation in her chest that she described as palpitations and chest tightness.  (Tr. 379-80.)  An examination of plaintiff's lungs appeared normal, and plaintiff refused to undergo an electrocardiogram ("EKG").  (*Id.*)  Dr. Chen referred plaintiff to a podiatrist and ear, nose, and throat ("ENT") specialist.  (*Id.*)

Plaintiff had a routine visit for medication refills with Dr. Chen on September 7, 2011.  (Tr. 381-82.)  At this time, she was taking the following medications: Avelox; Symbicort; Hydrochlorothiazide; Zithromax; Procardia; and Prednisone.  (*Id.*)  Dr. Chen noted that plaintiff reported a little dizziness, chest tightness that radiated to her throat, blurry vision, and swelling in her feet.  Plaintiff denied difficulty breathing.  (Tr. 381.)  Dr. Chen refilled her Procardia, Hydrochlorothiazide, Symbicort, and Ventolin inhaler, and also referred plaintiff to a podiatrist.  (Tr. 382.)

Plaintiff returned to Dr. Chen on September 23, 2011 after abnormal lab results. (Tr. 428-29.) She complained of numbness and tingling in her toes and fingers, the sensation of food being stuck in her throat, and shortness of breath, but denied any significant weight loss, abdominal pain, dysuria, hematuria, or any other symptoms. (*Id.*) Plaintiff admitted to taking a few puffs of cigarettes a day, no alcohol, and was noncompliant with her blood pressure medication. (*Id.*) Dr. Chen diagnosed hypertriglyceridemia, uncontrolled hypertension, sarcoidosis and prescribed Trilipix and Dyazide. (*Id.*) On October 10, 2011, plaintiff continued to complain about tingling in her toes and the feeling of food being stuck in her throat. (Tr. 431.) She stated that her new medication made her feel drowsy and nauseous. (*Id.*)

On November 10, 2011, plaintiff complained about having pain in her toes for three weeks with swelling and tingling, though the swelling decreased when ice was applied. (Tr. 435.) Plaintiff admitted smoking three cigarettes a day, having two drinks a day, and that she did not see a psychiatrist even though she had been referred to one. (*Id.*) Dr. Chen also mentioned that plaintiff "seemed a little out of it" and "possibly intoxicated." (*Id.*) Dr. Chen noted that plaintiff's blood pressure was very high and that plaintiff had not taken her medication that day. (*Id.*)

On November 28, 2011, Dr. Chen stated that plaintiff's blood pressure was under good management. (Tr. 437.) On December 7, 2011, plaintiff complained about chest pain but an EKG showed no acute ischemic changes, or restrictions on the blood flow to her brain. (Tr. 438-39.) Plaintiff continued to complain about chest discomfort on December 28, 2011. (Tr. 512.) Dr. Chen diagnosed uncontrolled hypertension, gastroesophageal reflux disease ("GERD"), and stated that her asthma was well controlled. (Tr. 513.) On January 25, 2012, plaintiff noted pain on her right wrist and was diagnosed with hypertension, sarcoidosis, and stable COPD. (Tr. 514-15.)

On April 30, 2012, plaintiff returned to Dr. Chen for a routine appointment. (Tr. 516-17.) She complained of dizziness, blurry vision, and headache and had not taken her blood pressure medicine in two days because she had run out. (*Id.*) Dr. Chen described plaintiff as noncompliant to her medication and emphasized to her the negative risks associated with noncompliance. (*Id.*) Plaintiff reported feeling depressed for three weeks and questioned whether life is worth living. (*Id.*) She described having imagined taking all her medications to end her life. (*Id.*) Dr. Chen referred plaintiff to a psychiatrist and prescribed Zoloft. (*Id.*)

On May 28, 2012 plaintiff refused to answer questions or participate in a physical exam. (Tr. 519-21.) Plaintiff had

a routine follow-up on June 12, 2012 and did not complain of pain, distress, fever, headache, or shortness of breath. (Tr. 522-24.) Dr. Chen noted that plaintiff wheezed on expiration and continued her medication for hypertension, hypocholesteremia, sarcoidosis and COPD. (*Id.*)

On July 31, 2012, plaintiff asked Dr. Chen to complete a multiple impairment questionnaire for her application for social security benefits, which Dr. Chen completed on the same day. (Tr. 525; *see* Tr. 489-96.) Plaintiff complained of pain and shortness of breath with light activity and that her new cholesterol medicine made her feel "different," but a physical examination was unremarkable. (*Id.*) Dr. Chen referred her to ophthalmology, and continued her on treatment for her sarcoidosis, COPD, hypercholesterolemia, and hypertension. (Tr. 525.)

In the multiple impairment questionnaire, Dr. Chen diagnosed plaintiff with sarcoidosis, hypertension, and listed her primary symptoms as shortness of breath and tightness in throat and chest during activity. (Tr. 489-90.) He estimated her range of pain and fatigue to be nine out of ten, where ten represents the highest severity of pain, and that plaintiff's pain was not relieved without unacceptable side effects from medication. (Tr. 491.) Dr. Chen concluded that plaintiff could not sit, stand, or walk for more than one hour in an eight-hour

day and could occasionally lift and carry five to ten pounds.
(Tr. 491-92.)  He further concluded that plaintiff does not have
fine motor skill limitations such as grasping, turning, or
twisting objects and using fingers/hands for fine manipulations.
(Tr. 492-93.)  Dr. Chen noted moderate limitations in
plaintiff's ability to use her arms for reaching.  (Tr. 493.)
He stated that plaintiff's pain and other symptoms would
constantly interfere with her ability to work and would last at
least twelve months.  (Tr. 494.)  She would be incapable of even
low stress because it would aggravate her symptoms and she would
require a two-minute break every fifteen minutes.  (*Id.*)  Dr.
Chen stated plaintiff was prone to good and bad days and would
likely be absent from work more than three times a month.  (Tr.
495.)  Dr. Chen did not identify any clinical findings to
support his conclusions.  (Tr. 489.)

On August 24, 2012, plaintiff had no complaints and
physical examination showed her heart and lungs were
unremarkable.  (Tr. 526-28.)  Dr. Chen diagnosed controlled
hypertension, hypercholesterolemia, COPD, controlled GERD, and
continued her medication.  (*Id.*)  On September 21, 2012,
plaintiff complained of an enlarged, swollen neck, but denied
shortness of breath, chest pain and headache.  (Tr. 563.)  Her
heart and chest examination was unremarkable.  (*Id.*)

*Treatment Records with St. John's Episcopal Hospital South Shore*

Plaintiff was treated at St. John's Episcopal Hospital South Shore on November 22, 2010 for complaints about a lump in her left upper arm, which plaintiff reported had been there for five years  (Tr. 454.)  She was advised to have surgery but plaintiff refused.  (*Id.*)  On June 21, 2011, plaintiff returned with complaints of chest tightening and was diagnosed with sarcoidosis and COPD.  (Tr. 350.)  She was prescribed Symbicort and Spiriva.  (*Id.*)  On June 30, 2011, plaintiff underwent spirometry testing at the referral of Dr. Rothman, the results of which are discussed *infra,* at pages 24, 31-32.  Plaintiff returned on July 27, 2011 for a cardiac examination, on August 2, 2011 for a pulmonary examination, and on September 13, 2011 for an ENT examination, however the progress notes for these examinations are illegible.  (Tr. 465, 468.)

On September 27, 2011, plaintiff complained of dizziness and a constant buzzing in her ear.  (Tr. 470, 472.) She was diagnosed with mild to moderate sensorineural hearing loss bilaterally.  (*Id.*)  On September 28, 2011, plaintiff was treated by a neurologist for complaints about vertigo.  (Tr. 471.) Plaintiff returned on October 4, 2011 for a pulmonary examination and on October 12, 2011 due to heart palpitations.

(Tr. 475.)  An ECG revealed left atrial enlargement, but was otherwise unremarkable.  (Tr. 476.)

On February 15, 2012, plaintiff was treated and noted that she has quit smoking.  (Tr. 479.)  She complained of an increased shortness of breath and an examination of her lungs revealed moderate diffused wheezing.  (*Id.*)  Plaintiff returned with chest complaints on February 28, 2012.  (Tr. 484.)  She complained of coughing, especially at night, phlegm, and hoarseness.  (*Id.*)  A chest examination revealed coarse breath sounds and occasional crackles.  (*Id.*)  Notes from a follow-up examination on July 3, 2012 are illegible.  (Tr. 486.)

c.    *Arbor WeCare Treatment Records*

On March 31, Arbor WeCare prepared a biopsychosocial summary.  (Tr. 289-308.)  The report indicated that plaintiff received food stamps and Medicaid.  (Tr. 294.)  Plaintiff reported that she did not have suicidal thoughts, but she feels depressed, has little interest or pleasure in doing things, feels tired and has little energy, has a poor appetite, and has trouble concentrating nearly every day.  (Tr. 293.)  Plaintiff reported that she had completed high school and obtained a diploma, and that she recalled being told she had a learning disability of not being able to focus.  (Tr. 295.)  She also indicated that she completed a three month training course to become a certified nurse's assistant.  (Tr. 296.)  Plaintiff

reported being a childcare provider for five years continuously until "business slowed."  (Tr. 296.)

Plaintiff reported spending the day at home, and that she washed dishes and her clothes, clothes, swept the floor, vacuumed, watched television, cooked meals, dressed and groomed herself, and socialized.  (Tr. 299.)  The Intake Specialist also noted that plaintiff reported suffering from high blood pressure, a mass on her left arm, impaired vision, headaches, dizziness, and that she was unable to lift or carry anything with her left arm.  (Tr. 299.)  After an examination, Dr. Nana Aivazi diagnosed plaintiff with hypertension, sarcoidosis, a left anterior soft mass, dizziness, depression and hypophosphatemia, or an abnormally low level of phosphate in the blood.  (Tr. 307.)  She recommended a follow-up with her primary care doctor for the hypertension, surgery for the shoulder mass, neurology for her dizziness, psychology for her depressive disorder, and a pulmonary specialist for her sarcoidosis.  (Tr. 308.)  Dr. Aivazi reported that plaintiff's hypertension, left anterior shoulder mass, dizziness, and depressive disorder were stable medical conditions that would impact plaintiff's employment.  (Tr. 308.)  Dr. Aivazi concluded that plaintiff was temporarily unemployable and unable to work due to her sarcoidosis flair, and that she needed better stabilization of her condition.  (*Id.*)

On approximately April 13, 2011, Tracey Lilly, a wellness case manager at Arbor WeCARE, created an initial wellness plan summary and re-exam wellness summary based on plaintiff's treatment at Arbor WeCare. (Tr. 326-37, 338-46.) In the initial wellness report, Ms. Lilly reported that plaintiff indicates she does not have a current or past history of substance abuse, completed high school, and has medical and/or mental health conditions that may significantly affect functioning. (Tr. 339, 344.) The initial wellness report also notes plaintiff's complaints that she suffers from high blood pressure, a mass on her left arm and impaired vision, and that her symptoms include headaches, dizziness, pain in her arm, and fluid build-up in her lungs which she treats with Prednisone. (Tr. 344.) Plaintiff also reported being unable to lift or carry anything. (*Id.*)

In both reports, Ms. Lilly noted that plaintiff was diagnosed with hypertension, sarcoidosis, left anterior shoulder soft mass, dizziness, depressive disorder, and hypophosphatemia. (Tr. 335, 343.) Ms. Lilly noted in both reports that plaintiff had unstable or untreated sarcoidosis. (Tr. 340.) Plaintiff's stable medical conditions were hypertension, left anterior shoulder soft mass, dizziness, and depressive disorder. (Tr. 343.) The reports both conclude that plaintiff is unable to work at present due to sarcoidosis flair, that she needs better

stabilization of her condition, but is able to use public transportation.  (Tr. 336, 343.)

      d.   *Dr. Nathan Rothman, M.D., Pulmonologist*

Dr. Rothman conducted chest radiographs at St. John's Episcopal Hospital on June 21, 2011.  (Tr. 395.)  Frontal and lateral views revealed that plaintiff's lungs were clear, had no pleural abnormality, and that plaintiff's heart and mediastinum, or central thoracic cavity, appeared intact.  (*Id.*)  Dr. Rothman noted that there is no evidence of active chest disease.  (*Id.*)  In an undated treating physician's wellness report that was faxed to the City of New York Department of Social Services on June 21, 2011, Dr. Rothman indicated that plaintiff was unable to work for at least 12 months.  (Tr. 369.)

On June 30, 2011, Dr. Rothman conducted a spirometry.[6] (Tr. 462-64.)  The predicted forced vital capacity ("FVC") value was 2.81, with a pre bronchodilator ("premed") test result of 0.86 (30% of the predicted value) and post bronchodilator ("post-med") result of 1.86 (66%).  The predicted forced expiratory volume in one second ("FEV1") value was 2.32, with a premed result of 0.86 (37%) and post-med result of 1.33 (55%).

---

[6] Spirometry tests are pulmonary function tests for asthma which measures how much air an individual can blow out of the lungs and how quickly to determine the amount of airway obstruction in the lungs.  Spirometry can be done before and after the patient inhales a short-acting medication called a bronchodilator, such as albuterol.  The bronchodilator causes the patient's airways to expand, allowing for air to pass through freely. *Lung Function Tests for Asthma,* WebMD.com, *available at* http://www.webmd.com/asthma/guide/lung-function-tests-asthma.

(*Id.*)  Dr. Rothman noted poor patient cooperation.  (*Id.*)  The
spirometry results indicated a normal residual volume, severely
reduced FEV1, reduced FEV1/FVC, reduced FEV25-75, and very
severely reduced diffusing capacity.  (*Id.*)  The Flow Volume
Loop also showed mixed obstructive and restrictive lung disease.
(*Id.*)  Dr. Rothman diagnosed plaintiff with minimally reduced
vital capacity and total lung capacity.  (*Id.*)  Dr. Rothman
noted that plaintiff had an apparent good response to
bronchodilators and the test results were consistent with mild
restrictive lung disease with a very severely reduced diffusing
capacity.  (*Id.*)

On July 31, 2012, Dr. Rothman conducted another
spirometry examination.  (Tr. 498-500.)  The predicted FVC was
2.80, with a premed result of 1.74 (62%) and a post-med value of
1.43 (51%).  (*Id.*)  The predicted FEV1 value was 2.30, with a
premed result of 1.40 (60%) and post-med result of 1.27 (55%).
(*Id.*)  Dr. Rothman did not make a note of patient's cooperation.
(*Id.*)  Plaintiff was diagnosed with a minimally reduced vital
capacity, reduced total lung capacity, reduced FEV1, and
residual volume.  (*Id.*)  Plaintiff's FEV1/FVC was normal fully
reduced, FEV25-75 was reduced, the diffusing capacity is
severely reduced, and a flow volume loop showed a restrictive
pattern.  (*Id.*)  Dr. Rothman noted that plaintiff had no
response to inhaled bronchodilators and concluded that the

findings were consistent with a mild to moderate restrictive lung disease. (*Id.*)

## 2. Consultative Examiners

### a. *Dr. Iqbal Teli, Consultative Examiner*

On September 27, 2011, Dr. Iqbal Teli, an internal medicine specialist, conducted a consultative examination on plaintiff. (Tr. 384-86.) He noted that her chief complaint was a history of sarcoidosis since the age of 20 and shortness of breath after walking about two blocks and that this had been occurring for the past three years. (Tr. 384.) He noted that she had no history of hospitalizations, diabetes, heart disease, asthma, emphysema, or seizures, but reported a history of hypertension since 2010. (*Id.*) She explained that she had a history of sarcoidosis since age 20, history of hypertension since 2010, and no history of diabetes, heart disease, asthma, emphysema, or seizures. (*Id.*) She stated that she smoked since she was a teenager and she smokes two packs in a week. (*Id.*)

Plaintiff indicated that she cooks twice a week, and showers and dresses herself daily. (*Id.*) Dr. Teli noted that plaintiff seemed to be in no acute distress, and that her gait was normal, squat full, and stance normal. (*Id.*) Plaintiff was unable to walk comfortably on heels and toes, but needed no help changing, getting on and off the exam table and had no difficulty rising from her chair. (Tr. 384-85.) An examination

of plaintiff's chest, lungs, and heart were normal.  (Tr. 385.)

Plaintiff had full range of motion in her shoulders, elbows,

forearms, wrists, hips, knees, and ankles.  (*Id.*)  Dr. Teli

noted that plaintiff's left knee jerk was absent, but noted no

sensory deficit.  (*Id.*)  Dr. Teli also noted that plaintiff's

fine motor activity in hands and fingers were intact with a grip

strength of 5/5 bilaterally.  (Tr. 386.)

Dr. Teli diagnosed a history of sarcoidosis and

hypertension and noted that the plaintiff had mild restrictions

for prolonged walking and climbing.  (Tr. 386.)

b.  *Spirometry by Dr. Linell Skeene,*
    *Consultative Examiner*

Dr. Linell Skeene conducted a pulmonary functions test

during a consultative medical examination on October 28, 2011.

(Tr. 396-98.)  The predicted FVC value was 2.94, with a premed

value of 1.50 (51%) and post-med of 2.10 (72%).  (*Id.*)  The

predicted FEV1 value was 2.36, with a premed value of 0.92

(39%), and post-med value of 1.68 (71%).  (*Id.*)  Dr. Skeene

noted that claimant's ability to understand direction and

cooperate was fair, but she could not blow hard enough.  (*Id.*)

Dr. Skeene diagnosed a severe obstruction but noted that there

was no respiratory difficulty.  (*Id.*)

c.  *RFC by S. Chimmiri, Consultative Physician*

Dr. S. Chimmiri, a consultative physician reviewed plaintiff's medical history evidence and completed an RFC on November 1, 2011. (Tr. 400-05.) Dr. Chimmiri found that plaintiff can lift or carry twenty pounds occasionally, ten pounds frequently, can stand and/or walk about six hours in an eight-hour workday, and has unlimited ability to push and/or pull. (Tr. 401.) Dr. Chimmiri also concluded that plaintiff could occasionally climb and balance, and can frequently stoop, kneel, crouch , and crawl. (Tr. 402.) Dr. Chimmiri further concluded that plaintiff has no communicative limitations, manipulative limitations, visual limitations, or environmental limitations, except that she must avoid a concentrated exposure of fumes, odors, dusts, gases, or poor ventilation. (Tr. 402-03.) Dr. Chimmiri noted plaintiff's complaints and symptoms and found that her statements are "credible but not to the degree alleged." (Tr. 404.)

### 3. Other Medical Test Results

A blood test on March 31, 2011 conducted by Woodhull Medical and Mental Health Center revealed decreased levels of red blood cells (RBC) and phosphate, and elevated levels of mean cell hemoglobin (MCH), cholesterol, LDL cholesterol, and gamma glutamyl transpeptidase (GGTP). (Tr. 312-20, duplicates at 358-67.)

**D. Additional Medical Records Submitted to the Appeals Council**

> **1. Pulmonary Impairment Questionnaire from Dr. Nathan Rothman, Pulmonologist**

Dr. Rothman completed a pulmonary impairment questionnaire on February 12, 2013 indicating that the plaintiff's first date of treatment was in June 2011 and the most recent on February 12, 2013. (Tr. 553-59.) Dr. Rothman diagnosed plaintiff with the medical conditions of asthma and sarcoidosis and the clinical findings of shortness of breath, episodic acute bronchitis and coughing. (Tr. 553-54.) Dr. Rothman made the following conclusions. Plaintiff can sit for one hour in an eight hour work day and stand or walk for zero to one hour. (Tr. 556.) Plaintiff can occasionally lift and carry zero to ten pounds, but never anything heavier. (*Id.*) Plaintiff frequently experiences symptoms severe enough to interfere with attention and concentration and it is predicted to last at least twelve months. (Tr. 558.) The impairments are likely to produce good and bad days and plaintiff would have to miss work two to three times a month. (*Id.*) Plaintiff would have to avoid wetness, odors, fumes, temperature extremes, dust, perfumes, gas, solvents/cleaners, cigarette smoke, soldering fluxes, and chemicals. (Tr. 558-59.)

2. <u>Additional Treatment Notes from Dr. Chen,
Treating Family Practitioner</u>

On February 15, 2013, plaintiff complained of lower
back discomfort. (Tr. 565.) A lungs and heart examination was
unremarkable, but the following results were abnormal:
cholesterol, cholesterol/HDL, HDL cholesterol, LDL cholesterol,
squamous epithelial cells, and triglycerides. (Tr. 565-66.) On
March 25, 2013, plaintiff had a routine appointment with Dr.
Chen and complained about migraines and lower back pain. (Tr.
567.) On April 10, 2013, Dr. Chen noted that plaintiff had
stopped taking Imitrex because she felt dizzy and disoriented.
(Tr. 569-70.) Physical examination revealed mild wheezing in
the lungs and scattered rhonchi. (*Id.*) Scattered wheezing was
still present on April 24, 2013. (Tr. 571-72.) Plaintiff
admitted to occasional shortness of breath and that she had
missed her appointments for podiatry and ophthalmology. (*Id.*)

Plaintiff returned to Dr. Chen on May 20, 2013 and
June 19, 2013 for medication refills. (Tr. 573-575.) On July
17, 2013 a physical by Dr. Chen revealed nothing remarkable
about the lungs. (Tr. 577-78.) On September 11, 2013,
Plaintiff complained about left upper arm pain and requested
physical therapy. (Tr. 579-80.) Plaintiff returned to Dr. Chen
on September 25, 2013 with a new complaint of pain radiating
from her right leg. (Tr. 581-82.) On October 16, 2013,

plaintiff complained about feeling fatigued and experiencing hot flashes. (Tr. 584.) Plaintiff complained of throat pain on November 6, 2013 and swelling and pain in her left foot. (Tr. 587-91.) A general physical examination found mild diffuse wheezing in the lungs on January 22, 2014. (Tr. 594-95.)

On October 30, 2013, plaintiff had a radiograph of the lumbar spine, which revealed no acute fracture or subluxation, and mild degenerative changes on the lower lumbar spine from level L3 to L5. (Tr. 598.)

## DISCUSSION

### I. The Parties' Arguments

Plaintiff raises four main arguments on her motion for judgment on the pleadings. (*See* Pl. Mem.) First, plaintiff argues that the ALJ erred when she found that plaintiff is not *per se* disabled under the Medical Listings ("the Listings") 3.02(C)(1) in Part 4, Subpart P, Appendix 1 because plaintiff's June 30, 2011 and July 31, 2011 single breath DLCO test results fit within the criteria of the listings. (Pl. *Mem.* at 8-9.) Medical Listing 3.02(C)(1) provides that "[c]hronic pulmonary insufficiency" and "[c]hronic impairment of gas exchange due to clinically pulmonary disease" may be established with a single breath DLCO that is "10.5 ml/min/mm HG or less than 40% of the predicted normal value." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02(C)(1). Plaintiff's June 30, 2011 DLCO results showed 1.12

31

ml/min/mm HG and July 31, 2012 test results showed 7.28 ml/min/mm HG. (*Id.*) Plaintiff argues that the ALJ failed to specifically state whether she considered Medical Listings 3.02(C)(1) or, if she did, why plaintiff did not qualify as *per se* disabled under the listing. (*Id.*)

Defendant argues that the ALJ correctly found that the plaintiff did not meet Medical Listing 3.02(C)(1) and considered the entirety of Medical Listings of 3.00 and 4.00, which included Medical Listing 3.02(C); thus, it was not necessary that the ALJ mention Listing 3.02 specifically. (Def. Mem. at 24.) Although plaintiff's DLCO scores fit within the criteria of Listing 3.02(C)(1), her results do not qualify due to plaintiff's failure to meet the testing parameter requirements in Listing 3.00(F). (*Id.* at 22-23.) Medical Listing 3.00(F) specifies requirements regarding the inspired volume, the required time spent inhaling and holding her breath, the washout volume, plaintiff's ability to follow direction, and, notably, that two acceptable DLCO test result values must be within ten percent or three ml/min/mm HG of each other. (*Id.*)

Second, plaintiff argues that the ALJ failed to follow the treating physician rule when she afforded plaintiff's treating physician, Dr. Chen, less than controlling weight. (Pl. Mem. at 9-15.) Specifically, plaintiff argues that the ALJ did not identify what evidence in the record conflicts with Dr.

Chen's opinions and failed to address the necessary factors promulgated in the Regulations when affording Dr. Chen's opinion less than controlling weight. (*Id.* at 10-11, 14-15.) Plaintiff instead argues that Dr. Chen's opinions are consistent with pulmonary function tests and plaintiff's complaints in the record. (*Id.* at 11-12.) Plaintiff argues that plaintiff's testimony does not contradict Dr. Chen's opinion, because plaintiff's ability to engage in limited activities does not establish that she can perform a full-time job. (*Id.*) Furthermore, plaintiff argues that the ALJ improperly afforded Dr. Teli's opinion considerable weight despite the fact that Dr. Teli was a one-time consultant who did not have access to plaintiff's prior health record. (*Id.* at 12-13.)

Defendant argues that the ALJ properly assigned Dr. Chen's opinion limited weight because Dr. Chen identified limitations in his RFC questionnaire that were not supported by medical evidence, and his treatment notes, the Arbor WeCare reports, and Dr. Teli's reports all demonstrate mainly normal findings and clear lungs. (*See* Def. Mem. at 25-27.) Further, defendant contends that plaintiff's statements about her ability to do various daily activities are inconsistent with Dr. Chen's opinion that she cannot stand, walk, or sit for more than one hour a day. (*Id.* at 25-26.) Additionally, defendant argues that specialization is also a factor to be considered by the ALJ

when determining the weight to afford an opinion, and Dr. Chen is certified in family practice, not internal medicine or pulmonology. (*Id.* at 26.)

Third, plaintiff argues that the ALJ failed to properly evaluate plaintiff's credibility. (Pl. Mem. at 15-17.) Plaintiff contends that the ALJ's findings are not supported by substantial evidence, and instead relies primarily on Dr. Teli's opinion. (*Id.* at 16-17.) Plaintiff further argues that the ALJ found that the plaintiff's medications controlled her impairments, but failed to identify any specific evidence in support of this conclusion. (*Id.*) Defendant argues that the medical evidence in the record does not support the plaintiff's testimony, and that the ALJ properly evaluated the plaintiff's credibility upon consideration of plaintiff's treatment and medication, which the ALJ noted was not unusual and appeared effective. (Def. Mem. 27-29.) The ALJ also noted plaintiff's noncompliance with her blood prescription medicine, as well as her daily activities and inconsistent statements regarding her physical limitation, in reaching a finding on credibility. (*Id.* at 28-29.)

Finally, plaintiff argues that remand is warranted based on new evidence presented to the Appeals Council. (Pl. Mem. at 17-19.) Plaintiff argues that the evidence is new and material, as it pertains to the plaintiff's disability during

the alleged period and because there is a reasonable possibility that the new evidence would have influenced the ALJ's decision. (*Id.* 18-19.)  The defendant argues that the new evidence is not material because it does not relate to the period on or before the date of the ALJ's hearing decision, October 26, 2012.  (Def. Mem. at 30-32.)

## II.  Applicable Legal Standards

### A.  Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir. 1998).

When a claimant challenges the denial of disability benefits, a court does not have the authority to review the Commissioner's decision *de novo,* and may not substitute its own judgment for that of the ALJ, even when it might justifiably have reached a different result.  *Cage v. Comm'r of Soc. Sec.,*

692 F.3d 118, 122 (2d Cir. 2012); *Wright v. Colvin*, No. 14-CV-1439, 2015 WL 1782335, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *Butts v. Barnhart*, 288 F.3d 377, 384 (2d Cir. 2004). A district court may remand the case on the basis of whether correct legal standards were applied or whether substantial evidence supports the decision. *Wright*, 2015 WL 1782335, at *2 (internal citation omitted); *Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *9 (E.D.N.Y. Mar. 17, 2013) (citing *Butts*, 388 F.3d at 384). Courts should "not hesitate to remand the case for further findings or a clearer explanation of the decision." *See Hernandez v. Astrue*, 814 F. Supp. 2d 168, 184 (E.D.N.Y. 2011) (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

If there is substantial evidence in the record to support the findings of the Commissioner, the court must uphold the decision and cannot impose its own judgment. *Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208, at *8 (E.D.N.Y. Dec. 9, 2010) (internal citation omitted); *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 273 (citing *Alston v. Sullivan*, 904 F.2d 122, 128 (2d Cir. 1990)). The substantial evidence rule applies not only to the Commissioner's factual findings, but also to inferences and conclusions of law to be drawn from those facts. *Albano v. Colvin*, No. 14-CV-3650, 2015 WL 1782339, at *2 (E.D.N.Y. Apr. 16, 2015) (citing *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999)).

Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion, *Cataneo*, 2013 WL 112626, at *9 (citing *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004)), and requires "more than a mere scintilla." *Wright*, 2015 WL 1782334, at * 2 (quoting *Richardson v. Perales* 402 U.S. 389, 401 (1971)); *see Cantaneo,* 2013 WL 112626, at *9; *Hernandez*, 814 F. Supp. 2d at *184 (internal citation omitted). Inquiry into legal error requires the court to ask whether "the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

## III. The Commissioner's Five-Step Analysis

To receive disability benefits, a claimant must first prove that she has a disability under the meaning of the Act, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see Wright*, 2015 WL 1782335, at *3; *Williams*, 2010 WL 5126208, at *9. The impairment must be of "such severity" that the claimant is "unable to do his previous work" and "engage in any other kind of substantial gainful work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner must consider the following in determining a claimant's entitle to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability. . .; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999)) (modifications in original) (internal citation omitted).

The Social Security Administration has promulgated a five-step sequential analysis where the Commissioner must evaluate:

> (1) if the claimant is engaged in substantial work activity. If the claimant is currently participating in substantial work activity, the claimant cannot be found disabled. (2) The claimant has a severe impairment that significantly limits the claimant's ability to do basic work or activities. (3) If the impairment meets or equals a listing in Appendix 1 of the regulation. If the Commissioner determines, solely based on the medical evidence, that the claimant's impairment is listed in Appendix 1, he will consider the claimant disabled without analyzing factors such as age, education, and work experience. (4) If the impairment is not listed in Appendix 1 and despite the severity of the claimant's current impairment, does the claimant have the residual functional capacity to perform past work. (5) If no, is there other work the claimant can perform.

*See* 20 C.F.R. §§ 404.1520, 416.920; *Wright*, 2015 WL 1782335, at
*3; *Williams*, 2010 WL 5126208, at *9.

When conducting this analysis, the Commissioner must
consider the impact from all injuries and not whether each
impairment separately would be sufficiently severe to establish
disability. *Hernandez*, 814 F. Supp. 2d at 180. In steps one
through four of the sequential five-step framework, the claimant
bears the "general burden of proving . . . disability." *Burgess
v. Astrue* 537 F.3d 117, 128 (2d Cir. 2008); *Wright*, 2015 WL
17882335, at *4 (citing *Selian v. Astrue*, 708 F.3d 409, 418 (2d
Cir. 2013)). At the fifth step, the burden shifts from the
claimant to the Commissioner, requiring that the Commissioner
show that, in light of the claimant's age, education, and work
experience, the claimant can still engage in gainful employment
within the national economy. *Williams*, 2010 WL 5126208, at *10
(citing *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y.
1997)). The Commissioner may be aided by "the Grid" contained
in Regulations, 20 C.F.R Part 404, Subpart P, Appendix 2. *Id.*
at *10.

**IV.  The ALJ's Disability Determination**

On October 26, 2012, using the five-step sequential
process to determine whether a claimant is disabled as mandated
by 20 C.F.R. § 404.1520(a)(4), the ALJ determined that the
plaintiff is not disabled under sections 216(i) and 223(d) of

the Act.  (Tr. 46.)  At step one, the ALJ found that plaintiff
had not engaged in substantial gainful activity since the
alleged onset of disability, November 2, 2010.  (Tr. 34.)  At
step two, the ALJ determined plaintiff suffered from the
following severe impairments: pulmonary impairments with
diagnoses of sarcoidosis, asthma, and COPD, and hypertension.
(*Id.*)  Additionally, the ALJ stated that plaintiff's
hypercholesterolemia, GERD, depression, cyst/mass on her left
upper arm, and mild hearing loss were non-severe because these
conditions have not resulted in more than minimal limitations in
plaintiff's ability to perform basic work functions.  (Tr. 36.)

At step three, ALJ determined that neither a single
impairment nor the combination of plaintiff's impairments meet
the severity of one listed in 20 C.F.R. Part 404, Subpart P,
Appendix 1.  (Tr. 34-35.)  The ALJ gave specific consideration
to listings 3.00 and 4.00.  *Id.*  Noting paragraphs A and B of
listing 3.02 and paragraph A of 3.04, the ALJ determined the
plaintiff's spirometry results do not fit within the necessary
criteria. (*Id.*)  The ALJ found that only some values matched
those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and
furthermore, plaintiff's spirogram results were not
reproducible.  (Tr. 36.)

At step four, the ALJ found that plaintiff is capable
of performing past relevant work as a childcare attendant.  (Tr.

46.)  Although the ALJ stated that plaintiff had the RFC to
perform less than the full range of light work, this does not
preclude her from the ability to perform the functions necessary
for childcare.  (Tr. 37, 46.)  The ALJ determined that the
plaintiff can lift/carry and push/pull 20 pounds occasionally
and 10 pounds frequently.  (Tr. 37.)  Plaintiff can sit, stand
and walk for six hours in an eight hour work day.  (*Id.*)  The
plaintiff is limited to no more than frequent stooping,
kneeling, crouching, or crawling, no more than occasional
climbing of ramps or stairs, and cannot climb ladders, ropes or
scaffolds.  (*Id.*)  The plaintiff cannot work in environments
involving exposure to weather, extreme heat or extreme cold, wet
or humid conditions, and environments requiring exposure to
atmospheric conditions or toxic/caustic chemicals.  (*Id.*)

        The ALJ found that the plaintiff's medically
determinable impairments could reasonably be expected to cause
the alleged symptoms, but that plaintiff's statements concerning
the intensity and persistence of her impairments was not fully
credible.  (Tr. 38.)  Relying on Dr. Teli's findings and Dr.
Chen's progress notes from October 2011, December 2011, June
2012, and July 2012, the ALJ held that the plaintiff's
allegations were not consistent with the clinical examination
reports, which primarily indicated results within normal limits.
(Tr. 43.)  Further, the ALJ found that the plaintiff's

41

medications and dosages are not unusual and appear to be effective without adverse side effects. (*Id.*) Finally, the ALJ noted that the claimant's own statements indicate her ability to take part in daily living activities, albeit more slowly and with breaks. (Tr. 44.)

In making her RFC determination, the ALJ afforded considerable weight to Dr. Teli, limited weight to Dr. Chen, limited weight to Dr. Rothman, and limited weight to Arbor WeCare. (Tr. 45.) The ALJ gave Dr. Teli's opinion considerable weight because of his specialty in internal medicine and because his opinion was supported by examination results. (*Id.*) Although the ALJ acknowledged that Dr. Chen is the plaintiff's treating doctor, she afforded limited weight to Dr. Chen's opinion, based on her finding that the evidence and claimant's own statements do not support Dr. Chen's limitations regarding plaintiff's ability to sit, stand, and walk. (*Id.*) The ALJ also afforded Dr. Rothman's opinion limited weight, based on her finding that the record does not support Dr. Rothman's opinion that plaintiff is unable to work for twelve months and because Dr. Rothman's opinion as to plaintiff's ability to work was an issue reserved for the Commissioner. (*Id.*)

Finally, the ALJ afforded Arbor WeCare's opinion that plaintiff is unable to work limited weight, based on her finding plaintiff's condition appeared stable with a treatment regimen

and because the diagnostic studies of plaintiff's chest and lungs do not reflect an active pulmonary disease process. (*Id.*) Even though the spirometry reflected a significant pulmonary problem, the ALJ concluded that plaintiff's condition appears stable with a treatment regime that does not require ongoing steroid use, nebulizer use, or recurrent urgent care. (*Id.*) The ALJ again noted that the determination of whether plaintiff is able to work is reserved for the Commissioner. (*Id.*) Finally, the ALJ afforded no weight to the November 2011 physical RFC assessment by the State agency consultant, as this is not an acceptable medical source. (*Id.*)

Because the ALJ found that plaintiff is capable of past relevant work, the ALJ did not reach Step Five. (Tr. 46.)

## V. Analysis

### A. The ALJ did not Err in Finding that Plaintiff was Not *Per Se* Disabled Under Medical Listing 3.02(C)(1)

Step Three of the five-step analysis for disability claims requires a determination of whether the plaintiff is *per se* disabled under the meaning of the Act. *Cataneo*, 2013 WL 1122626, at *11. The ALJ must determine whether the plaintiff's medical evidence, irrespective of age, education, and work experience, meets or equals a listing in Appendix 1 of Part 404, Subpart P of the Act. 20 C.F.R. § 404.1520(a)(4)(iii), (d); *Alcantara*, 667 F. Supp. 2d at 275 (internal citation omitted).

43

If the ALJ finds that the plaintiff has an impairment that meets or equals a medical listing in Appendix 1, the claimant is considered disabled within the meaning of the Act. *Alcantara*, 667 F. Supp. 2d at 275 (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), (d)). "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment." *Gladden v. Comm'r of Soc. Sec.*, 536 F. Supp. 2d 403, 419 (S.D.N.Y. 2008), *aff'd* 337 F. App'x 136 (2d Cir. 2009) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995)).

Medical Listing 3.00 describes impairments resulting from respiratory symptoms. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 3.00, *et seq*. Plaintiff argues that she meets the requirements under Medical Listing 3.02(C)(1), chronic impairment of gas exchange due to clinically documented pulmonary disease, which is determined based on a single breath DLCO or arterial blood gas values. 20 C.F.R. Pt. 404, Subpt P. App. 1 §§ 3.02(c)(1)-(2). Under the DLCO standard, plaintiff must have a DLCO value of less than 10.5 ml/min/mm HG or less than 40 percent of the predicted value. *Id.* at § 3.02(C)(1).

An ALJ, however, will only consider single breath DLCO test results that comply with the requirements listed in Listing 3.00(F)(1) of Appendix 1. *Id.* Specifically, the test results should be based on an inspired volume ("VI") of at least 90 percent of the previously determined vital capacity ("VC"), *Id.*

at § 3.00(F)(1), the inspiratory time for the VI should be less than 2 seconds, and the breath-hold time should be between 9 and 11 seconds. *Id.* The washout volume should be between 0.75 and 1.00, unless the VC is less than 2 liters, in which case the washout volume would be reduced to 0.5 liters. *Id.*

The DLCO value used in a disability assessment should also represent the mean of at least two acceptable measurements. *Id.* These two test results should be within 10 percent of each other or 3 ml/min/mm HG, whichever is larger. *Id.* Further, the ability of the individual to follow directions and perform the test properly should be stated in the written report. *Id.* Sufficient data must be provided, including documentation of the source of the predicted equation, to permit verification that the test was adequately conducted. *Id.*

Plaintiff argues that the ALJ did not specifically indicate whether she considered Medical Listing 3.02(C)(1), or if she did, why plaintiff did not meet this listing. Although the ALJ stated that "specific consideration was given to listings 3.00 and 4.00," the ALJ never mentioned 3.02(C)(1) or discussed the DLCO values of the spirometry tests. (Tr. 35-36.) Instead, the ALJ focuses on the FEV1 and FVC values which are used in the determination of the listings she explicitly mentions (§§ 3.02(A), (B) and 3.04(A)). (Tr. 35-36.) There is

no indication whether the ALJ considered listing 3.02(c)(1), nor an explanation of why plaintiff does not meet this listing.

Nevertheless, remand is unnecessary where application of the correct legal standard could lead to only one conclusion. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (citing *Schaal*, 134 F.3d at 504-05. Although, the ALJ does not explicitly address Listing 3.02(C)(1), if she had, plaintiff would still fail to meet the listing criteria. First, the plaintiff's DLCO results are not within 10 percent or 3 ml/min/mm HG of each other. *See* 20 C.F.R. Pt. 404, Subpt P. App. 1 §§ 3.02(F)(1). Section 3.00(F)(1) requires that "two acceptable tests should be within 10 percent of each other or 3 ml CO(STPD)/min/mm Hg, whichever is larger." *Id.* "The percent difference should be calculated as 100 × (test 1 − test 2)/average DLCO." *Id.* On June 30, 2011, plaintiff had a DLCO result of 1.12 ml/min/mm HG or 4 percent of predicted value. (Tr. 462.) On July 31, 2012, plaintiff had a DLCO result of 7.28 ml/min/mm HG or 29 percent of predicted value. (Tr. 499.) Thus, even assuming that plaintiff's two tests were acceptable, the results are or 147 percent[7] or 6.16 ml/min/mm HG apart.

Second, for both tests the VI were not 90 percent of the VC as required under Medical Listing 3.00(F)(1). The June 30 test had a VI of 1.00 and a VC of 1.64, and VI is 61 percent

---

[7] 100 x (7.28 − 1.12) / 4.2 = 146.66.

of VC.  (Tr. 462.)  On July 31, the VI was 0.90, VC was 1.74, and VI was 52 percent of the VC.  (Tr. 499.)  Third, the June 30 spirometry results indicated that the patient demonstrated poor cooperation, but the July 31 test is silent with respect to patient cooperation.  (Tr. 464, 498.)  Fourth, neither test indicates the inspiratory time, breath-hold time, washout volume, or documentation to permit verification.  (Tr. 462-64, 498-501.)

Therefore, because plaintiff's DLCO test results do not satisfy the requirements of Medical Listing 3.02(F)(1) and 3.02(C)(1), the plaintiff does not fit within the criteria of 20 C.F.R. Pt. 404, Subpt P. App. 1 § 3.02(C)(1) and remand is unwarranted on this basis.

### B.    The ALJ Failed to Provide "Good Reasons" For Affording Dr. Chen's Opinion Less than Controlling Weight

Plaintiff argues that the ALJ failed to follow the "treating physician rule" when she assigned "limited weight" to the opinions of Dr. Chen, plaintiff's treating source, and assigned "considerable weight" to the opinions of Dr. Teli, a consultative source.  (Pl. Mem. at 10.)  Specifically, plaintiff argues that Dr. Chen's opinion should have been given substantial weight because Dr. Chen's "opinions were based on evidence of chest pain on exertion, edema in the hands and feet, dyspnea on lying down, dizziness with loss of consciousness,

tingling and numbness in the toes and finger, tinnitus in the left ear, and blurry retinal vessels bilaterally." (Pl. Mem. at 11.) Moreover, plaintiff argues that Dr. Chen's opinions are also consistent with pulmonary function testing that indicated severe deficits in plaintiff's lung functioning. (*Id.* (citing Tr. 388-90, 396-99, and 498-99).) Finally, plaintiff argues that the ALJ failed to set forth "good reasons" for not crediting Dr. Chen's finding of disability or assess the factors set forth under the Act, 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(d)(2)-(6).

The regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(c), 416.927(c). "Acceptable medical sources" that can provide evidence to establish an impairment include, *inter alia,* plaintiff's licensed treating physicians and licensed or certified treating psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). In addition, the ALJ may rely on "other sources" to provide evidence of "the severity of [a plaintiff's] impairment." 20 C.F.R. § 404.1513(d). Such other sources include, *inter alia*, other medical professionals including social workers, as well as non-medical sources such as caregivers, parents, and siblings. *Id.*

Under the "treating physician rule," a medical opinion of the physician engaged in the primary treatment of a claimant is given controlling weight if such opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Wright*, 2015 WL 1782335, at *6 (internal citation omitted); *Williams*, 2010 WL 5126208, at *12 (citing 20 C.F.R. §§ 404.1527(d)(2)(2011), 416.927(d)(2)(2011)). Medically acceptable clinical and laboratory diagnosis techniques include consideration of a patient's report of complaints or history. *Burgess,* 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)); *Hernandez*, 814 F. Supp. 2d at 182. According to the Commissioner's regulations, the opinions of treating physicians deserve controlling weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Balodis*, 704 F. Supp. at 264.

Although the Commissioner may not substitute his own judgment for competent medical opinion, the final finding of disability is reserved to the Commissioner, not the treating

physician. *Cabassa v. Astrue*, 2012 WL 2202951, at *7 (E.D.N.Y. June 13, 2012) (citing *Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009)); *Williams*, 2010 WL 5126208, at *12 (internal citation omitted). If other substantial evidence in the record conflicts with the treating physician's opinion, the treating physician's opinion is not afforded controlling weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal citation omitted) (holding that the treating source did not get controlling weight because it conflicted with other physician's opinions); *Burgess*, 537 F.3d at 128 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts.") (internal citation omitted).

Where a treating physician's opinion on the nature and severity of a claimant's disability is afforded less than controlling weight, the ALJ must comprehensively set forth "good reasons" for the weight assigned in order that the claimant may understand the disposition of his or her case. *See Cabassa*, 2012 WL 2202951, at *7 (citing *Burgess*, 537 F.3d at 129); *Williams*, 2010 WL 5126208, at *13 (internal citation omitted). Failure to provide "good reasons" for not crediting a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. *Sanders v. Comm'r of Soc.*

*Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (citing *Schaal,* 134

F.3d at 505); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496,

507 (S.D.N.Y. 2014) (holding that the ALJ erred by "failing to

explicitly consider several required factors, including [the

treating source's] specialty, and the frequency, length, nature,

and extent of treatment"); *Balodis*, 704 F. Supp. 2d at 267

(remanding case for ALJ's failure to apply the treating

physician rule because there was "no reference in the ALJ's

decision to the various factors that must be considered in

deciding what weight to give the opinion of a treating

physician").

Although the regulations do not exhaustively define

what constitutes "good reasons" for the weight given to a

treating physician's opinion, the regulations provide the

following factors as guidelines that the ALJ must explicitly

consider:

> (1) the length of the treatment relationship
> and the frequency of examination, (2) the
> nature and the extent of the treating
> relationship, (3) the supportability of the
> treating source opinion, (4) the consistency
> of the opinion with the rest of the record,
> (5) the specialization of the treating
> physician, and (6) any other relevant
> factors.

20 C.F.R. §§ 404.1527(c)(2)(6), 416.927(c)(2)-(6); *see Wright*,

2015 WL 1782335, at * 6 (citing *Selian*, 708 F.3d at 418;

*Williams* 2010 WL 5126208, at *12.

Here, the ALJ afforded Dr. Chen's opinion limited weight. (Tr. 45.) In finding Dr. Chen's opinion that plaintiff could sit, stand, and walk less than one hour during an eight-hour work day, (Tr. 491), unsupported by the record, the ALJ relied on and gave considerable weight to consultative examiner Dr. Teli's opinion that plaintiff had only "mild restriction" for prolonged walking and climbing. (Tr. at 41, 45.) The "ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." *Donnelly v. Comm'r of Soc. Sec.*, 49 F. Supp. 3d 289, 305 (E.D.N.Y. 2014) (citing *Moore v. Astrue,* 07-CV-5207, 2009 WL 2581718, at *10 n.22 (E.D.N.Y. Aug. 21, 2009). "[C]onsultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Hernandez*, 814 F. Supp. 2d at 182-83 (quoting *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584 at *9). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue,* 07-CV-4554, 2009

WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir. 1990)).

The ALJ did not explicitly consider the evidence corroborating Dr. Chen's opinion and rejected the fact that Dr. Rothman, the pulmonary specialist, diagnosed plaintiff with mild to moderate restrictive lung disease and concluded that plaintiff was unable to work for twelve months. (Tr. 369, 462-64.) Moreover, the Arbor WeCare opinion, which the ALJ also accorded limited weight, indicated that the plaintiff was "temporarily unemployable" and unable to work due to her sarcoidosis flair, and that her sarcoidosis required additional stabilization before she could resume work. (Tr. 45, 308, 343 (duplicate).)

The ALJ's failure to provide "good reasons for not crediting the opinion of a claimant's treating physician is ground for remand." *Burgess*, 537 F.3d at 129-30 (citing *Snell*, 177 F.3d at 133 (2d Cir. 1999); *Schaal*, 134 F.3d at 505 (2d Cir. 1998)); *Wright*, 2015 WL 1782335, at *6 (internal citation omitted). Here, remand is also required because the ALJ rejected the medical opinions of treating physician Dr. Chen without specifically setting forth "good reasons" for doing so and without attempting to reconcile Dr. Chen's opinion with the conflicting opinions of the treating and consultative physicians in the record. *See Cabassa*, 2012 WL 2202951, at *8 (remanding

where ALJ afforded little weight to the treating physician and gave only conclusory reasons in his explanation).  The ALJ assigned limited weight to Dr. Chen's opinion regarding plaintiff's ability to walk, stand, or sit because it was "not supported by the evidence as well as the claimant [*sic*] own statements about her activities."  (Tr. 45.)  The ALJ noted that, "while some limitations as to hazards, environmental factors, and postural activities are accepted, the record fails to support a prohibition with regard to any such activity."  (*Id.*)  The ALJ acknowledged that the length, frequency, and nature of the treating relationship indicate that Dr. Chen was plaintiff's treating physician and could be given deferential weight.  (Tr. 45.)  However, the ALJ found that Dr. Chen's lack of specialization in internal medicine or pulmonology and the failure of medical support for Dr. Chen's opinion outweighed these factors.  (*Id.*)

Although the ALJ indicated that she must consider factors including the examining relationship, the treatment relationship, supportability, specialization and any other factors that support or contradict the opinion, the ALJ only specifically addressed the fact that Dr. Chen is not a pulmonary specialist or internist and that Dr. Chen "repeatedly examined and treated the [plaintiff]."  (Tr. 45.)  The ALJ, however, failed to specify which objective findings and evidence were

inconsistent with or contradicted Dr. Chen's opinion or what
evidence supported it.  *See Cabassa*, 2012 WL 2202951, at *8
(citing *Lopez-Tiru v. Astrue*, No. 09-CV-1638, 2011 WL 1748515
(E.D.N.Y. May 5, 2011)).

Finally, the ALJ failed to reconcile Dr. Chen's
opinion – which indicates that plaintiff is not able to do
sedentary work - with that of Dr. Teli, which indicates mild
restrictions with respect to walking and standing.  The ALJ is
also required to reconcile materially divergent medical opinions
in determining the RFC of the plaintiff, and failure to do so is
also grounds for remand.  *Cabassa*, 2012 WL 2202951, at *7
(citing *Caserto v. Barnhart,* 309 F.Supp.2d 435, 445
(E.D.N.Y.2004)) (noting that "[a]n ALJ's failure to reconcile
materially divergent RFC opinions of medical sources is also a
ground for remand.).

Accordingly, the case is remanded with further
instruction to the ALJ to review the totality of the evidence in
the record and if she declines to afford controlling weight to
Dr. Chen's opinion, the ALJ shall state her findings and provide
good reasons for the weight afforded Dr. Chen's opinion,
including specifying which statements from the plaintiff's
testimony and medical evidence support or contradict Dr. Chen's
opinion with respect to plaintiff's limitations on sitting,
standing, and walking.  Additionally, the ALJ shall reconcile

Dr. Chen's opinion with those of Dr. Teli and Arbor WeCare and other conflicting evidence in the record.

### C. The ALJ's Credibility Determination

A claimant's statements of pain or other subjective symptoms cannot alone serve as conclusive evidence of disability. *Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012) (citing *Genier v. Astrue,* 606 F.3d 46, 49 (2d. Cir. 2010) (citing 20 C.F.R. § 1529(a)); *see Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). If the plaintiff offers statements about pain or other symptoms not substantiated by the objective medical evidence, the ALJ is required to engage in a credibility inquiry. *Felix*, 2012 WL 3043203, at *8 (citing *Meadors v. Astue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order)).

The Commissioner has established a two-step process that an ALJ must follow in evaluating a claimant's credibility with regard to her assertions about pain and other symptoms and their impact on claimant's ability to work. *Felix,* 2012 WL 3043203, at *8 (citing *Genier*, 606 F.3d at 49); *Cabassa*, 2012 WL 2202951, at *13; *Williams*, 2010 WL 5126208, at *13 (internal citation omitted). First, the ALJ must determine if the plaintiff has a medical impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(b); *Felix*, 2012 WL 3043203, at *8 (internal citations

56

omitted); *Williams*, 2010 WL 5126208 at *13 (citing *Genier*, 606 F.3d at 49 (2d Cir. 2010)). Second, if the claimant does suffer from an impairment that could reasonably be expected to produce the pain and symptoms alleged, the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine if [the claimant's] symptoms limit [her] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *see Cabassa*, 2012 WL 2202951, at *13; *William*, 2010 WL 5126208, at *13 (internal citation omitted). If the claimant's statements are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. *Meadors*, 370 F. App'x at 183 (citing 20 C.F.R. § 404.1529(c)(3)

Plaintiff's credibility will be given considerable weight if her statement about pain is consistent with objective clinical evidence. *See* 20 C.F.R. § 404.1529(c)(4); *Kane v. Astrue*, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013). When the plaintiff's symptoms are at a greater severity than indicated by the objective medicine alone, the ALJ should consider the following factors: (1) plaintiff's daily activities; (2) location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken; (5) other treatments; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the plaintiff's functional

limitations due to pain or other symptoms.  20 C.F.R. §
404.1529(c)(3)(i)-(vii); *see Kane*, 942 F. Supp. 2d at 314;
*Williams*, 2010 WL 5126208 at *14 (internal citation omitted).
The ALJ, however, is not required to discuss all seven factors
as long as the decision "includes precise reasoning, is
supported by evidence in the case record, and clearly indicates
the weight the ALJ gave to the claimant's statements and the
reasons for that weight." *Felix*, 2012 WL 3043203 at *8 (citing
*Snyder v. Barnhart*, 323 F. Supp. 2d at 546-47 & n.5 (S.D.N.Y.
2004)).  The ALJ's rationale must be sufficiently specific for a
reviewing court to determine that the ALJ's decision was based
on substantial evidence.  *Cabassa*, 2012 WL 2202951, at *13
(citing *Morrison v. Astrue*, No. 08-CV-2048, 2010 U.S. Dist.
LEXIS 115190, at *12 (E.D.N.Y. 2010)); *Williams*, 2010 WL
5126208, at *20 (citing *Alcantara*, 667 F. Supp. 2d at 278);
*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d
Cir. 1998)).

　　　　The ALJ found that the plaintiff's medically
determinable impairment could reasonably be expected to cause
the alleged symptoms.  (Tr. 38.)  However, the ALJ found that
the plaintiff's statements concerning the intensity and
persistence of her symptoms were not fully credible and accorded
her allegations and testimony limited weight.  (Tr. 38, 44.)

The court respectfully finds that the ALJ's credibility analysis is insufficient. Although it was within the ALJ's discretion to make a final decision that plaintiff was not "entirely credible," the ALJ failed to make specific findings explaining her credibility findings based on specific evidence to enable effective review. The ALJ failed to state what of plaintiff's statements, if any, she found to be credible, the weight given to plaintiff's statements, and the reasons for affording such weight. *See* SSR 96-7p; *Villani*, 2008 WL 2001879, at *11 (remanding for determination of plaintiff's credibility, which must contain specific findings based upon substantial evidence in a manner that enables effective review).

The ALJ found that plaintiff's allegations are not consistent with her complaints or clinical examination results that "are primarily within normal limits" and her reports which indicate that she "has a good range of activities of daily living, and . . . is no more than moderately limited in any area of functioning." (Tr. 43-44.) The ALJ also noted seven doctor appointments where plaintiff's diagnostic testing of blood pressure, range of motion, and discomfort were within normal limits. (Tr. 43.) However, the medical evidence in the record of plaintiff's symptoms is not consistent over the course of her medical treatment, and indeed, the severity of plaintiff's symptoms and the degree of her complaints oscillate throughout

the years.  For example, on six other occasions, the plaintiff experienced elevated blood pressure, (Tr. 284, 287, 350, 370, 371, 377, 512), and on at least fourteen different doctor appointments, complained of chest tightening or pain.  (Tr. 284, 287, 350, 370, 373, 374, 377, 379, 381, 428, 430, 438, 489, 525.)  As discussed *supra*, although Dr. Teli determined that plaintiff has only mild limitations, both Dr. Chen and Arbor WeCare opined that plaintiff's RFC is more severely restricted with respect to sitting, walking, standing, and her ability to work.  (*See* Tr. 308, 336, 384-86, 443-48, 489-96.)  Moreover, an RFC report from Dr. Skeene indicated that plaintiff had "severe obstruction" in her lungs after conducting pulmonary tests. (Tr. 397.)

The ALJ cannot "simply selectively choose evidence in the record that supports [her] conclusions" and must give specific reasons indicating why she found certain doctor appointments and medical opinions more significant than others when assessing plaintiff's credibility.  *Cabassa*, 2012 WL 2202951, at *15 (citing *Gecevic v. Sec'y of Health and Human Servs*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995)).

Further, the ALJ's analysis of the factors addressed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) is insufficient because the ALJ fails to adequately detail the basis for her credibility determination or "identify what facts [s]he found to be

significant, [or] indicate how [s]he balanced the various factors.". *Kane*, 942 F. Supp. 2d at 314 (citing *Simone v. Astrue*, No. 08-CV-4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)); *Williams*, 2010 WL 5126208, at *20 (internal citation omitted).  The ALJ lists the factors that may be considered, but only discusses three of those factors: plaintiff's daily activities, precipitating and aggravating factors, and the effectiveness of plaintiff's medications.  (Tr. 43-44.)

Moreover, although the ALJ noted that the claimant takes longer than usual to complete household chores and requires breaks, she does not sufficiently explain how this is taken into consideration besides stating it "has been factored in assessing credibility."  (Tr. 44.)  The ALJ emphasized plaintiff's daily activities in reaching her conclusion that the plaintiff's ability to complete household chores indicate that "for the most part, her activities of daily living were intact." (Tr. 44.)  The ALJ did not address whether plaintiff could engage in these activities for an extended period, or how long she could engage in sitting, standing, or walking continuously. A plaintiff "need not be an invalid to be found disabled under the Social Security Act." *Cabassa*, 2012 WL 2202951, at *15 (citing *Meadors*, 370 F. App'x at 185 n.2).  The "Second Circuit has held that an individual who engages in activities of daily living, especially when these activities are not engaged in 'for

sustained periods comparable to those required to hold a sedentary job,' may still be found to be disabled." *Kaplan v. Barnhart*, No. 01-CV-8438, 2004 WL 528440, at *3 (E.D.N.Y. Feb. 24, 2004) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). "That the plaintiff . . . can cook daily, perform routine household chores once a week, go shopping. . . does not, without more, necessarily contradict her claim that she experiences pain when walking or sitting for more than 30 minutes." *Larsen v. Astrue*, No. 12-CV-414, 2013 WL 3759781, at *3 (E.D.N.Y. July 15, 2014). Without "further clarifications as to the nature of these activities," such daily activities cannot "undermine the plaintiff's allegations concerning her pain." *Id*.

The ALJ addressed plaintiff's non-compliance with treatment as an aggravating factor, noting plaintiff's non-compliance in medical records and plaintiff's testimony. (Tr. 37-44.) With respect to the effectiveness of plaintiff's medications, the ALJ only stated it "is not unusual for either type or dosage, and appear to have been effective and without adverse side effects," but did not identify any specific facts supporting this conclusion. (Tr. 43.) The ALJ did not explicitly address the location, duration, frequency and intensity of plaintiff's symptoms, any treatment other than

medications, any measured use to relieve pain, or any other factors concerning the plaintiff's limitations.  (Tr. 37-44.)

The ALJ's failure to set forth the factors with sufficient specificity and to assess the credibility of the plaintiff's testimony in light of the entire record is grounds for remand.  *Cabassa*, 2012 WL 2202951, at *15 (internal citation omitted).  Accordingly, on remand, the ALJ shall carefully and explicitly consider all of the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) and, if she still concludes that plaintiff is not credible, she should explicitly set forth all evidence considered in reaching such conclusion and provide specific reasons for her credibility findings.

### D.   Consideration of Plaintiff's Medical Records Submitted to the Appeals Council After the ALJ Hearing

Plaintiff argues that remand is warranted for the consideration of new, material evidence presented to the Appeals Council.  Under 42 U.S.C. § 405(g), the court may remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate the evidence into the record in a prior proceedings."  42 U.S.C. § 405(g); *see Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *see also* 20 C.F.R. §§ 404.970.  New and material evidence submitted after the ALJ's decision, shall be considered "only where it relates to the period on or before the date of the

administrative law judge hearing decision." 20 C.F.R.
§ 404.970(b); *Bailey v. Astrue*, 815 F. Supp. 2d 590, 599
(E.D.N.Y. 2011) (citing *Shalala v. Schaefer*, 509 U.S. 292, 297
(1993)); *Garcia v. Comm'r of Soc Sec.*, 496 F. Supp. 2d 235, 242
(E.D.N.Y. 2007) (citing *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir.
1996)). In order for a court to remand a case and order
additional evidence to be taken before the Commissioner, the
evidence must satisfy three requirements. *Houston v Colvin*, No.
12-CV-03842, 2014 WL 4416679, at *8 (E.D.N.Y. Sept. 8, 2014)
(citing *Tirado v. Bowen*, 842 F.2d 595, 567 (2d Cir. 1988));
*Flanigan v. Colvin*, 21 F. Supp. 3d 285, 307-08 (S.D.N.Y. 2014)
(citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). The
evidence must be: (1) new; (2) material; and (3) there must be
good cause for failing to present this evidence in earlier
proceedings." *Houston*, 2014 WL 4416679, at *8; *Bailey*, 815 F.
Supp. 2d at 599-600 (citing *Lisa v. Sec'y of Health & Human
Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)).

Evidence is considered "new" when the evidence is not
merely a cumulative account of what already exists in the
record. *Houston*, 2014 WL 4416679, at *8 (internal citation
omitted); *Bailey*, 815 F. Supp. 2d at 600 (internal citation
omitted). To be material the evidence must be relevant to the
plaintiff's condition during the alleged disability period and
probative. *Pollard v. Halter*, 193 (2d Cir. 2004). "The concept

of materiality requires, in addition, a reasonable possibility
that the new evidence would have influenced the [Commissioner]
to decide claimant's application differently." *Pollard*, 377
F.3d at 193 (quoting *v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988))
(internal quotation marks omitted); *Houston*, 2014 WL 4416670, at
*8 (quoting *Tirado*, 842 F.2d at 597 (2d Cir. 1988)).  Good cause
may be established by the non-existence of the evidence at the
time of the hearing.  *Pollard*, 377 F.3d at 193; *Canales v.
Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010);
*Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014)
(internal citation omitted).  Where "new evidence" is submitted
to the Appeals Council and part of the administrative record for
judicial review, however, a showing of good cause is not
necessary where the evidence was presented to the Appeals
Council, but the Appeals Council declined to consider it.  *See
Knight v. Astrue,* 10-CV-5301, 2011 WL 4073603, at *12 (E.D.N.Y.
Sept. 13, 2011) (citing *Perez,* 77 F.3d at 45).  New and material
evidence will not warrant remand if it "does not add so much as
to make the ALJ's decision contrary to the weight of the
evidence." *Rutkowski v. Astrue,* 368 F. App'x 226, 229 (2d Cir.
2010).

Plaintiff submitted additional evidence to the Appeals
Council after the ALJ had made her October 26, 2012 decision.
(*See generally* Tr. 553-98.)  The additional evidence includes a

pulmonary impairment questionnaire from Dr. Rothman, dated
February 21, 2013, (Tr. 553-59), and treatment records from Dr.
Chen dating from September 21, 2012 to January 22, 2014.  (Tr.
560-95.)  In a notice dated February 12, 2014, the Appeals
Council stated, without discussion, that it had considered the
additional evidence, but found that the information did not
provide a basis for changing the ALJ's decision.  (Tr. 6.)  The
Appeals Council also noted that some of the evidence was
duplicative of records before the Appeals Council and some of
the evidence was dated a year or more *after* the ALJ's decision.
(Tr. 6.)

Plaintiff argues that the evidence is new and material
because Dr. Rothman had not previously provided an opinion on
plaintiff's work-related limitations and is a pulmonologist.
(Pl. Mem. at 18.)  The plaintiff argues that Dr. Rothman's
pulmonary specialty is imperative, because the ALJ discredited
Dr. Chen's similar findings because Dr. Chen did not specialize
in pulmonology.  (*Id.*)  Defendant argues that the additional
evidence is not material because it post-dates the disability
period at issue.  (Def. Mem. at 30.)

As an initial matter, the fact that the additional
reports contain medical findings that were taken after the ALJ's
decision was issued on October 26, 2012, however, does not
automatically render the evidence immaterial as outside the

scope of the disability time period. *Pollard v. Halter*, 377
F.3d 183, 193 (2d Cir. 2004) (finding that district court erred
by categorically refusing to consider evidence because it was
generated after the ALJ's decision). Indeed, new evidence may
"disclose the severity and continuity of impairments existing"
before the ALJ's decision and "may identify additional
impairments which could reasonably be presumed to have been
present and to have imposed limitations" previously. *Drysdale
v. Colvin*, No. 14-CV-01722, 2015 WL 3776382, at *9 (S.D.N.Y.
June 16, 2015) (quoting *Lisa v. Sec'y of Dep't of Health and
Human Servs.,* 940 F.2d 40, 44 (2d Cir. 1991)).

Dr. Rothman's pulmonary impairment questionnaire
concludes that plaintiff suffers from asthma and sarcoidosis,
resulting in symptoms of shortness of breath, episodic acute
bronchitis, and coughing. (Tr. 553-54.) Dr. Rothman opines
that plaintiff is only able to sit one hour in an eight-hour
workday, stand or walk zero to one hours in an eight-hour
workday, lift up to ten pounds occasionally and carry up to ten
pounds occasionally. (Tr. 556.) He also noted that patient
experienced fatigue and other symptoms severe enough to
interfere with attention and concentration frequently, that she
would require unscheduled breaks during the work day, and that
she would need to avoid wetness, odors, fumes, extreme
temperatures, dust, perfumes, gases, solvents/cleaners,

cigarette smoke, soldering fluxes and chemicals in a work place. (Tr. 558-59.)   Although Dr. Rothman's findings are substantially similar to Dr. Chen's conclusions in an earlier multiple impairment questionnaire, Dr. Rothman is a pulmonologist and, thus, his opinion is that of a specialist. (Tr. 489-96, 553-59.)   Moreover, Dr. Rothman's conclusions in the February 12, 2013 questionnaire are more specific with regard to plaintiff's limitations, as compared to earlier reports that only indicated that plaintiff was unable to work for a period of twelve months.

Dr. Rothman's findings were one of a treating pulmonary specialist.  Since the ALJ afforded limited weight to Dr. Chen's opinions in part because he was not a pulmonary specialist, but rather an internist, a determination by a pulmonary specialist that accords with Dr. Chen's diagnosis is probative and warrants remand.  *Canales*, 698 F. Supp. 2d at 342 (remanding for consideration of treating psychiatrist's findings where ALJ based her rejection of treating physician's primarily on the basis that they were not psychiatrists).

The additional progress notes of Dr. Chen reflect the plaintiff's monthly visits where she continued to complain of the same symptoms and no new pulmonary diagnosis was made.  (Tr. 560-95.)  Therefore, because Dr. Chen's reports are cumulative and do "not add so much as to make the ALJ's decision contrary

to the weight of the evidence," *Rutkowski,* 368 F. App'x at 229, remand is not warranted with respect to this evidence.

Accordingly, on remand, the ALJ should consider the additional evidence of Dr. Rothman's pulmonary questionnaire, but need not consider Dr. Chen's progress notes.

### CONCLUSION

For the foregoing reasons, the court remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

1) Review the totality of the evidence in the record and, if the ALJ declines to afford controlling weight to Dr. Chen's opinion's regarding plaintiff's ability to stand, walk, and sit, the ALJ shall provide a clear and explicit statement of the "good reasons" for weight given in accordance with the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), ensuring to cite specific facts and evidence from the medical record. The ALJ shall also explicitly reconcile Dr. Chen's opinion with those of Dr. Teli and Arbor WeCare in order to adequately explain the ALJ's residual functional capacity determination;

2) Give specific reasons for the credibility assigned to plaintiff's statements concerning the intensity, persistence, and limiting effects of her pain and

other symptoms in light of the entire medical record. The ALJ must also take into consideration the factors enumerated in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) with sufficient specificity and references to the record so that the court can consider whether the ALJ's credibility determination is supported by substantial evidence; and

3) Consider on remand the additional evidence provided by plaintiff, in particular the pulmonary impairment questionnaire by Dr. Rothman, dated February 12, 2013.

**SO ORDERED.**

Dated:     Brooklyn, New York
           August 14, 2015

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York
